IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 5, 2022 Session

**STATE OF TENNESSEE v. MCARTHUR BOBO**

**Appeal from the Criminal Court for Shelby County**
**No. 08-02588    Chris Craft, Judge**
_____

**No. W2021-00650-CCA-R3-CD**
_____

The Defendant-Appellant, McArthur Bobo, was convicted by a Shelby County criminal court jury of second-degree murder in 2009. Following a remand from our supreme court, the trial court held a new hearing on the Defendant's motion for new trial on May 12, 2021, which the trial court denied. On appeal, the Defendant contends that the trial court erred 1) in denying the motion for new trial because it was unable to act as thirteenth juror in determining the sufficiency of the evidence; 2) in failing to grant a mistrial or striking the testimony of a witness whose written statement was allegedly not provided to the Defendant; 3) in denying the Defendant's motion to suppress; 4) in admitting jailhouse calls into evidence; 5) in allowing testimony that children were present near the shooting scene; and 6) in failing to grant a mistrial based on a totality of all errors. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

Terrell L. Tooten, Cordova, Tennessee, for the Defendant-Appellant, McArthur Bobo.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell and Abby Wallace, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On April 17, 2008, a Shelby County grand jury returned a one-count indictment against the Defendant charging him with second-degree murder. He was convicted as charged on July 24, 2009, and received a total effective sentence of sixty years at 100% to

be served in the Tennessee Department of Correction. On direct appeal, the Defendant asserted that his Fifth Amendment rights and due process rights were violated by the State's use of jailhouse phone calls to impeach his sister, that the trial court erred in failing to suppress allegedly suggestive photographic identifications of him, and that the trial court erred in allowing testimony that children were present near the shooting. See State v. McArthur Bobo, No. W2009-02565-CCA-R3, 2011 WL 2464207, at *1 (Tenn. Crim. App. June 21, 2011), perm. app. dismissed (Tenn. June 21, 2011). This court affirmed the Defendant's sentence and conviction on direct appeal. Id. Although our supreme court initially dismissed the Defendant's application for permission to appeal, the post-conviction court allowed the Defendant to enter a delayed Rule 11 application, which he filed six months after it was due, and our supreme court again dismissed the application as untimely. See Order, State v. McArthur Bobo, No. W2009-02565-SC-R11-CD (Tenn. July 14, 2014).

On November 26, 2014, the Defendant filed a pro se petition for post-conviction relief in which he alleged ineffective assistance of counsel. Post-conviction counsel was appointed, and the Defendant filed an amended petition on April 30, 2015. In the petition, the Defendant alleged that trial counsel was ineffective for not requesting a mistrial or striking testimony from the record when the State failed to produce the written statement of witness Kenya Samuels, failing to include that issue, the jailhouse call issue, and the testimony regarding children being present issue in the motion for new trial, and failing to object when the trial court confused the facts of the Defendant's case with facts from another case at the motion for new trial hearing. See McArthur Bobo v. State, No. W2017-00681-CCA-R3-PC, 2018 WL 5115689, at *2 (Tenn. Crim. App. Oct. 19, 2018), perm. app. granted (Tenn. Feb. 27, 2019). The post-conviction court denied relief, and this court affirmed the denial of the petition. Id. at *9. The Defendant appealed, and our supreme court granted permission to appeal solely "for the purpose of remanding the case to the original trial judge for a hearing on [the Defendant's] motion for new trial filed November 2, 2009." See Order, McArthur Bobo v. State, No. W2017-00681-SC-R11-CO (Tenn. Feb. 27, 2019). The Defendant filed an "amended motion for judgment of acquittal or in the alternative motion for new trial" on August 30, 2019, which the trial court overruled following a hearing on May 12, 2021.

This court gave a brief summation of the facts on direct appeal:

This case arises out of the defendant's December 23, 2007 shooting of Michael Gibbs, which resulted in the victim's death. According to the State's proof at trial, the [D]efendant had been in a fight with another man at the victim's apartment complex approximately two days before the shooting. Therefore, when the [D]efendant came to the apartment complex on the evening of December 23, 2007[,] and stood outside an apartment where a

- 2 -

birthday party was about to take place, the victim approached him and told him that he was a troublemaker and that the residents of the complex did not want him there. As the victim turned to walk away, the [D]efendant mumbled a response. When the victim turned back around to ask the [D]efendant what he had said, the defendant pulled a gun out of his jacket and fired at the victim's feet. The victim ran in an attempt to escape, but the [D]efendant pursued and fired either two or three additional shots at the victim before fleeing, leaving the victim to die at the scene.

McArthur Bobo, 2011 WL 2464207, at *1.

A more detailed factual background is necessary for analysis in the instant appeal. At the May 29, 2009 motion to suppress hearing,[1] April Bowman testified that she went to an "apartment complex on Claybrook" on the night of December 23, 2007, to purchase drugs. She arrived at the complex between 8:00 and 9:00 p.m., and after purchasing the drugs, was inside her vehicle preparing to leave the complex when the Defendant walked up to her car and was holding the door open and talking to her. The Defendant offered Bowman money to have sex with him, which she declined. She recognized the Defendant as someone with whom she had previously had sex for money. After she declined, the Defendant "started to walk off" when he walked up to the victim, Michael Gibbs, and Gibbs "said something to him." The Defendant then "pulled out a gun and just started shooting." Although the complex did not have lights, Bowman was able to see the shooting because her headlights were still on. Bowman "stopped moving" when the shooting started, and everyone else who was outside the complex "scattered[.]" Bowman watched the Defendant chase Gibbs around an SUV and around her vehicle and fire three or four shots from "a black gun." Bowman watched the Defendant "r[un] away and le[ave]" following the shooting. Bowman exited her vehicle once the Defendant was gone, and other people reemerged from the complex. Bowman never saw Gibbs bleeding, but she saw that he had gunshot wounds. Bowman testified that people at the scene "said that he was bleeding on the inside[.]" Bowman saw Kenya Samuels give Gibbs CPR, and when he resumed breathing, bystanders tried to put Gibbs in the SUV to take him to the hospital. However, police arrived while they were trying to put him in the SUV, and the police "told them to take him back out of the truck and lay him back down on the ground[,] and that's when he died." Bowman went with police "to the station to give a statement[.]" Police originally wanted to "take [her] car" to "get the fingerprints off" it, but she did not think that ever occurred. Bowman identified the Defendant in a photographic lineup as the shooter "an hour or less" after police arrived at the shooting scene. She stated that the Defendant was

---

[1] Although the motion to suppress hearing transcript was not included in the record on appeal, it was included as an exhibit in the post-conviction record, and this court may take judicial notice of its own records. See State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009). We further take judicial notice of the trial transcripts.

wearing "a red leather jacket" with "blue stripes" during the shooting, and she was "sure" that the person she identified in the photographic lineup was the same person who committed the shooting.

On cross-examination, Bowman clarified that she went to the apartment complex to buy "crack." She testified that she was "not high" when she arrived at the complex. She reiterated that after she got back inside her vehicle following the drug transaction, the Defendant approached her car and stood between the car door and the car while he "solicited [her] for sex[.]" Bowman testified that the first and only time she had sex with the Defendant in exchange for money was approximately "two and a half weeks" prior to the shooting. She did not learn the Defendant's name until after the shooting occurred. Bowman testified that the Defendant and Gibbs were standing "almost on [her vehicle's] hood" when the shooting started. Though she put her vehicle in reverse, she "hadn't really moved" when the shooting began. She observed the Defendant pull a gun out of his jacket pocket and hold it in his right hand when he began firing the gun. Although Bowman "ducked" when the shots began, she could "see above the dashboard." She could not remember how many people were outside the complex when the shooting began but stated there were "at least" two.

Memphis Police Department ("MPD") Officer C. C. Smith testified that he worked with the felony response unit and was asked to take Bowman's statement on December 23, 2007, at 11:00 p.m. Officer Smith presented an advice of rights form "to a witness viewing a photo display" and a photographic lineup to Bowman, which she signed. She "immediately" identified photograph number 3, a photograph of the Defendant, as the person who shot Gibbs. Officer Smith elaborated that "as soon as [the lineup] was presented to her, she said, ['T]hat's him, right there.[']" When asked if she was "positive" that the person she identified had shot Gibbs, Bowman answered affirmatively. On cross-examination, Officer Smith explained that Sergeant Brewer had created the photographic lineup.

Willie Bobo testified that he lived at the Claybrook apartment complex and was hosting a birthday party for his brother at his apartment on December 23, 2007. Bobo saw the Defendant and Gibbs, who also lived in the apartment complex, talking at Bobo's front door. Bobo testified that the Defendant was his "distant cousin." Bobo was standing approximately two doors down from his apartment and overheard Gibbs and the Defendant's conversation, which "wasn't friendly" but did not "seem like . . . an argument[.]" Bobo heard Gibbs say, "[W]e don't want you to do it like that around here, you know, I live here, you know, this is where we live." The Defendant responded, "[O]kay[,] I hear you[,] man[.]" Gibbs then "got ready to leave" and said, "[T]hat's all I'm saying" and "turned" to walk away from the Defendant. When he turned, the Defendant said, "[H]ey[,] man" and subsequently "pulled a pistol and shot him[.]" After the

Defendant fired the first shot, Gibbs ran, and the Defendant "chased after him" and "fired a couple [] more times." Gibbs ran "down beside [Bobo's] brother's truck and another car that was sitting there." Bobo estimated that he was standing approximately seventy feet from the Defendant when he began shooting, but he testified that he knew the Defendant was the shooter because he had to pass by the Defendant and Gibbs when he exited his apartment. The Defendant "took off and ran" after shooting Gibbs.

Following the shooting, Bobo and others tried to help Gibbs, who was lying on the ground between the SUV and Bowman's vehicle. Bobo testified that Gibbs did not have visible wounds, but he "started to bleed from the mouth." Someone called 911, and Bobo and other bystanders tried to put Gibbs in the SUV to take him to the hospital, but police arrived and instructed them to put Gibbs back on the ground. Gibbs died at the scene. Bobo told officers at the scene that the Defendant had committed the shooting. Bobo went to the police station and gave a statement, and he was easily able to "pick" the Defendant out of the photographic lineup because he had known him for "a good ten, fifteen years." He denied that the police told him whom to pick out of the photographic lineup. Bobo stated that he was "positive" that the person he picked out of the photographic lineup was the same person who shot and killed Gibbs. On cross-examination, Bobo clarified that the Defendant's mother was his "distant cousin[,]" and he knew the Defendant as a child, and they were also in jail together. He "spoke to both" the Defendant and Gibbs when he walked by them.

MPD Sergeant Kirby Brewer testified that he worked in the felony response unit and responded to the shooting scene on December 23, 2007. Sergeant Brewer interviewed Bobo at the scene. Bobo told Sergeant Brewer that he had witnessed the shooting and knew who had committed it but informed him that the officers at the scene had the "name wrong[.]" Bobo gave Sergeant Brewer the Defendant's name and was "absolutely certain" that the Defendant was the suspect police were searching for. Sergeant Brewer also interviewed Bobo at the police station and generated the photographic lineup that Bobo viewed. Sergeant Brewer testified that Bobo had "no hesitation" in identifying the Defendant in the photographic lineup and denied telling Bobo whom to choose out of the lineup.

Sergeant Brewer explained that he generated the photographic lineup with a computer program. To use the program, Sergeant Brewer entered the Defendant's "most recent booking photo[,]" and the computer program returned "a bunch of" booking photographs similar to the Defendant's. Sergeant Brewer then went "through the photos and tr[ied] to match [the Defendant's] photo with similar photos." The program returned "thousands" of photographs, and Sergeant Brewer selected photographs that matched the Defendant's characteristics of "[m]ale black, similar age, similar facial features, . . . maybe facial hair[,]" "hair on his head, complexion, [and] as many similar qualities" as possible.

Sergeant Brewer specifically tried to "match up" photographs that were similar to the Defendant's "very wide nose[,]" "kind of a mustache[,]" "light facial hair around his mouth[,]" "close cut hair[,]" and "medium to light complexion." Regarding the photographs' backgrounds, Sergeant Brewer explained that they "just do the best we can with what we get, what you get from the program." He testified that the "most important thing in a photo lineup" was the "actual face" of "the suspect in the photo."

On cross-examination, Sergeant Brewer agreed that the Defendant's photograph in the lineup had a lighter background than the other photographs and that the Defendant's skin in the photograph was "lighter than the other five" photographs.

The trial court ultimately denied the Defendant's motion to dismiss the photographic lineup, finding that even though the Defendant's photograph had more exposure than the other photographs, there was no "indication that he is the person[,]" and the witnesses were "identifying him in [c]ourt . . . not from a photograph that they were shown of him[] but from actually seeing him that night." Trial began on July 21, 2009.

Kenny Gibbs testified that he was the victim's brother.[2] Kenny testified that he went to the hospital upon learning that Gibbs had been shot. Gibbs "passed away in the operating room." On cross-examination, Kenny testified that Gibbs was his only brother.

April Bowman's trial testimony largely echoed that of her suppression hearing testimony. Bowman testified that she arrived at the apartment complex on Claybrook on December 23, 2007, between 8 and 9 p.m. She went to the complex to "buy some crack" but was not under the influence of drugs when she arrived. Bowman parked her car in front of the complex and exited the vehicle to buy crack from someone, whom she testified was not Gibbs. Bowman reentered her car and had started the ignition when a "guy stopped [her]" from shutting her door and was talking to her. The guy, later determined to be the Defendant, was "holding the door with one hand" and "had his other hand up on top of the car" while Bowman sat in the driver's seat. The Defendant was "trying to get [Bowman] to remember him" from when they previously met at "another drug house" where she had sex with him "[f]or money." Bowman explained that she could see the Defendant's face because the lights inside her car were on. The Defendant asked Bowman to have sex with him, to which she responded, "[N]o, thank you." She stated that the Defendant was wearing a "red[,] white[,] and blue" leather jacket. After declining the Defendant's invitation, Bowman "slammed [her] door" and was preparing to back out of her parking spot when Gibbs "said something" to the Defendant while they were standing in front of Bowman's car. The Defendant then "reached down in his jacket and . . . pulled out a gun"

---

[2] Because the witness and the victim share the same surname, we refer to the witness by his first name. We intend no disrespect in doing so.

and started shooting at Gibbs. Gibbs ran around the SUV that was parked next to Bowman's car in an attempt to escape the Defendant, but the Defendant gave chase and shot Gibbs. Gibbs "got back up" and ran around Bowman's car, where the Defendant followed him and shot him again. Bowman denied seeing Gibbs and the Defendant in an altercation and stated that Gibbs did not have a weapon. Following the shooting, Bowman was "scared" and moved residences because she "knew that [the Defendant] knew where she was[.]"

Bowman testified that she saw the Defendant shoot towards Gibbs at least three times. Following the shooting, Bowman observed the Defendant run "towards the entrance of the complex." Bowman put her car in park and exited via the passenger door because Gibbs "was laying up against the car." Bystanders then came back outside of the complex, and there "was a girl there [, Kenya Samuels,] trying to give [Gibbs] CPR." Gibbs resumed breathing, and Samuels stated that Gibbs "was bleeding on the inside" and "was going to die if they didn't get him to a hospital." Bystanders were placing Gibbs into the SUV to take him to the hospital when police arrived and told the bystanders to place Gibbs back on the ground. Bowman agreed that she gave police a formal written statement at the police station and identified the Defendant from a photographic lineup. She explained that she "knew it was him as soon as [she] saw the picture." She denied that police instructed her who to choose out of the photographic lineup.

On cross-examination, Bowman agreed that there were multiple people who sold drugs out of the apartment complex. She stated that Bobo used to live with her when he "needed somewhere to live." Bowman had known Samuels "about ten years" from being "in the neighborhood." She clarified that she was introduced to the Defendant "at a crack house" by his "cousin[.]" Bowman reiterated that she never saw Gibbs with a gun.

On redirect examination, Bowman agreed that she willingly gave police a statement and that they had not threatened her. She clarified that although the complex did not have a lot of lights, she was able to see the shooting because her headlights were turned on. She explained that although she bought drugs from Bobo's apartment, she did not actually purchase the drugs from Bobo. Bowman reiterated that her testimony was what she "remember[ed] happen[ing]."

Kenya Samuels testified that she lived in the downstairs portion of the Claybrook apartment complex in December 2007. Gibbs was engaged to Samuels' sister, Lateshia Samuels, at the time of his death. Samuels knew Bobo and Cartrevion Chapman, or "Trell," through living at the complex. Samuels testified that a birthday party was being held in Bobo's apartment for his brother, Derrick Bobo, on the night of the shooting. Samuels stated that there was a lightbulb outside every apartment door and "security lights on top of the building." She estimated that there were between thirty and forty people

"hanging out in the parking lot" on the night of the shooting.  Samuels testified that on the night of the shooting, she and Chapman walked to the corner store and saw the Defendant walking in front of them as they returned to the complex.  Samuels stated that the Defendant was wearing a black, white, and blue Oreo cookie leather jacket on the night of the shooting.  She recognized the Defendant because she met him "a couple of days prior" at Bobo's apartment.  Samuels elaborated that the Defendant was fighting with Chapman at Bobo's apartment.  Samuels saw the Defendant "just standing" in the complex parking lot for ten to fifteen minutes, and she felt that "something [was] not right[.]"  She relayed her fears to Bobo and his brother, and Gibbs "came downstairs" and told the Defendant that he had "caused enough trouble[,]" and they did not "want [him] over [t]here because [he was] a troublemaker, [he] could leave."  Gibbs turned to walk away, the Defendant said something to him, and when Gibbs turned back around to ask the Defendant what he said, the Defendant "immediately" fired a shot towards Gibbs' feet.  Samuels yelled at Gibbs to run, and the Defendant "chased" Gibbs as he attempted to escape.  As Gibbs ran around the parked SUV, the Defendant fired "approximately four shots[.]"  Samuels ran to Gibbs and initiated CPR.  Samuels described the Defendant's gun as silver and possibly .38 caliber.  After shooting Gibbs, the Defendant ran away from the complex while firing his gun, not "at anything in particular[.]"  Samuels administered CPR but was unsuccessful in reviving Gibbs, who was "gasping[.]"  Samuels was transported the police station to speak with police but was only able to give a "partial statement[.]"  She was "upset" and had "a hard time talking about what happened[,]" so police "came out and talked to" her the following day.

On cross-examination, Samuels agreed that the Defendant was approximately twelve to fifteen feet in front of her and Chapman as they walked towards the apartment complex.  She testified that she had "a little alcohol" the night of the shooting but denied ingesting any drugs or alcohol prior to the preliminary hearing.  She clarified that the Defendant was wearing a "leather-ish" coat with the Oreo cookie logo on it and dark jeans.  Samuels agreed that Gibbs told the Defendant that he could not sell drugs at the apartment complex because it was family-owned.  She denied that she tried to "duck" and "cover" herself while she yelled at Gibbs to run.  Samuels reiterated that the gun the Defendant fired was a silver revolver.  She testified that Bobo was nicknamed "Crip" due to having a "club foot or something when he was younger[.]"  Samuels clarified that when she went to the police station to give a statement following the shooting, she was "in shock" and "couldn't talk right then" because she was "crying[] and hyperventilating."  The police "c[a]me back later and took a statement" from her.  Samuels remembered police "typing as [she] was talking" when she attempted to give her original statement.  She did not remember initialing a statement but remembered "signing something."  She clarified that she signed a document regarding whether what she told police was "what happened to the best of [her] knowledge" when police talked to her two days later, not the night of the shooting.

Willie Bobo testified that he was in jail for "drug sales" at the time of trial. He denied that the State offered him "any kind of deal" in exchange for his testimony. Bobo's trial testimony was similar to that of his suppression hearing testimony. He reiterated that he was throwing a birthday party for his brother, Derrick Bobo, on the night of December 23, 2007. Bobo testified that Gibbs' children, a two-year-old daughter and a "five or six[-]month[-]old" daughter were present at the complex on the night of the shooting. Bobo reiterated that he walked past Gibbs and the Defendant having a "normal conversation" in front of Bobo's apartment door. He again testified that the Defendant was his distant cousin and that he had known him since the Defendant was twelve or thirteen years old. Bobo was walking to his neighbor's apartment a few doors down when he heard the Defendant say, "[H]ey, man" to Gibbs immediately before the Defendant fired the first shot. Bobo described the Defendant's gun as "a thirty-eight revolver or something like that." Gibbs ran, and the Defendant followed, firing "a couple of shots" before running past Bobo, away from the complex. Bobo explained that Methodist hospital was "about two blocks up the street[,]" so he and other bystanders decided to try to take Gibbs there because he was "struggling to breathe[.]" He reiterated the police arrived and instructed them to place Gibbs back on the ground. Bobo testified that the Defendant was the only person who possessed a gun on the night of the shooting. Bobo gave a statement at the police station and identified the Defendant from a photographic lineup at the station. Bobo chose the Defendant out of the lineup because he "saw him shoot" and was able to identify him "instantly." He denied that police instructed him to pick the Defendant out of the lineup. Bobo stated that he was "[o]ne hundred percent positive" of his identification of the Defendant as the shooter.

On cross-examination, Bobo agreed that he knew Bowman, Samuels, Gibbs, and Chapman and that all but Bowman lived at the Claybrook complex. He reiterated that he did not see anyone but the Defendant with a gun and described the gun as a chrome revolver. Bobo elaborated that he and Chapman tried to place Gibbs in Derrick Bobo's SUV to take him to the hospital before police arrived. Bobo agreed that he saw the Defendant and Chapman having an argument the day before the shooting. On redirect examination, Bobo elaborated that the fight between the Defendant and Chapman was "broke[n] up," and the two "hugged and shook hands" afterwards. He explained that in addition to the light outside each apartment door, the apartments had lights turned on inside that were coming through the windows, and it was "pretty lit up."

Cartrevion Chapman testified that he was in jail at the time of trial and that his friends referred to him as "Trell." He explained that Bobo was his stepfather and that they lived together in Bobo's apartment in December 2007. Chapman testified that on December 23, 2007, he was walking back to the complex with Samuels, whom he referred to as his "aunty," after visiting the corner store. The Defendant was walking in front of Chapman and Samuels on the way back to the complex, and Chapman noticed that the Defendant

had a gun in the pocket of his "blue and white" jacket. Chapman saw the Defendant talking to Bowman once they arrived at the complex, and he saw Gibbs exit Bobo's apartment. Gibbs told the Defendant that he needed to leave the complex because he was a "troublemaker[,]" and the Defendant told Gibbs that he was "going to sell dope wherever [he went]." Gibbs turned to walk away, and the Defendant called his name, and Gibbs turned around. The Defendant's first shot missed Gibbs, but he chased Gibbs as he attempted to retreat and shot him two times. The Defendant fired another shot as he ran away from the complex. He reiterated that Samuels performed CPR on Gibbs, and he and Bobo tried to put Gibbs in the SUV to take him to the hospital, but police arrived and made them put Gibbs back on the ground. He did not see Gibbs possess a gun. Chapman affirmed that people in the complex had their apartment lights turned on and their doors opened. He was "sure" that the Defendant was the person who shot Gibbs. Chapman gave a statement to police at the police station and picked the Defendant out of a photographic lineup. He denied that police instructed him who to choose. He explained that he wrote "Arthur Boyd" by the Defendant's photograph because he was "nervous[,]" and the police would not let him get the paper back to correct the name. Chapman described the gun the Defendant used as a "short thirty-right revolver" that was "gold and silver with a brown handle."

On cross-examination, Chapman denied that he was receiving anything in return for his testimony. Chapman testified that he was partially illiterate. He explained that he wrote "Arthur Boyd" instead of "McArthur Bobo" because Samuels began having an asthma attack while he was writing his statement, and he "hurried up and wrote it down" so that he could help Samuels. He stated that he told police that the shooter's name was McArthur Bobo. Chapman explained that he initialed his statement because he thought "police had the statement right[,]" though they did not read the statement back to him. He testified that he did not know anyone named Arthur Boyd.

On redirect examination, Chapman testified that he felt afraid during the shooting and was focused on the Defendant and Gibbs while it was happening. He clarified that he could write his name but could only read "[a] little bit." Chapman testified that police typed his statement while he was giving it and gave him the written statement to review and sign, but he was unable to read it. On recross-examination, Chapman agreed that police told him that one of six people depicted in the photographic lineup "could have been the guy" that shot Gibbs. On further redirect examination, Chapman clarified that he chose the Defendant out of the lineup because "that [was] the person who shot Mike Gibbs[.]"

MPD Officer Steven Foglesong testified that he worked as a patrol officer in December 2007. He and his partner, Officer Clayton Turner, responded to a "shots fired" call at the Claybrook apartment complex on December 23, 2007. He testified that when they arrived at the complex, he saw "about six people trying to load the victim into a[n]

SUV." Officer Foglesong explained that he instructed the group to place Gibbs back on the ground because they could have "been making it worse" and because he needed to determine if the group was suspects or witnesses. Gibbs had a pulse but was gasping for breath, and Officer Foglesong called for paramedics. There was no weapon near Gibbs. All of the people at the scene "were trying to help" and "trying to scream that they knew what was going on[,] and they knew who did it." Officer Foglesong developed the Defendant as a suspect "immediately[.]" There was some confusion at the scene as to whether the Defendant was named McArthur Boyd or McArthur Bobo, but Bobo gave the police the Defendant's date of birth, and they were "able to determine all of his information." The group told Officer Foglesong that the Defendant was wearing a "blue, red, and white racing jacket" and gave him an address "to check out[.]" He explained that they did not go door-to-door asking people questions because "[e]veryone that lived in the apartment complex was already outside." The felony response unit and crime scene unit also arrived at the shooting scene.

On cross-examination, Officer Foglesong estimated that between six and twenty people were in the parking lot when he arrived at the scene. He testified that they did not recover any shell casings or other physical evidence. On redirect examination, Officer Foglesong clarified that it was the felony response unit's job to interview witnesses and take their statements.

Memphis Fire Department ("MFD") Paramedic Eli Bredbenner testified that he responded to the Claybrook complex on December 23, 2007. He explained that when he examined Gibbs at the scene, he did not have a pulse and was not breathing. Paramedic Bredbenner observed an entrance wound on the left side of Gibbs' chest. Gibbs' wounds were not "actively bleeding[,]" and Paramedic Bredbenner observed a "bullet just riding underneath his skin" on the other side of Gibbs' chest. He began administering CPR to Gibbs and "placed him on a cardiac monitor." Paramedic Bredbenner started intravenous lines on Gibbs in order to administer fluids and drugs in an attempt to restart Gibbs' heart, but his efforts were unsuccessful. On cross-examination, Paramedic Bredbenner was unsure of how many bystanders were in the parking lot when he arrived but stated there "could have been" twenty people.

MPD Officer Marlon Wright testified that he was assigned to the crime scene unit and responded to the shooting scene on December 23, 2007. Officer Wright took photographs of the parking lot, collected measurements, and collected Gibbs' clothing. He also drew a diagram of the crime scene. Officer Wright recovered $60 in one-dollar bills and a bag containing 1.6 grams of "crack cocaine" from Gibbs' pants pocket. There were not shell casings at the scene, and Officer Wright did not collect DNA evidence because "[t]here wasn't anything to collect DNA evidence from." He was not "told that the suspect

had touched" any of the vehicles at the crime scene. He agreed that "just because a person is in the area[] does not necessarily mean they're going to leave [DNA] evidence[.]"

On cross-examination, Officer Wright agreed that he did not collect any physical evidence from the scene apart from Gibbs' clothing, the $60, and the crack cocaine. He agreed that if he had known that any vehicles at the crime scene were touched by a suspect, it would have been "prudent" to impound and process the vehicles.

On redirect examination, Officer Wright explained that he did not use every tool in his crime scene kit at every crime scene because not every crime scene warranted the use of every tool. He only investigated the parking lot because that was where the actual crime occurred.

Tennessee Bureau of Investigation ("TBI") Special Agent Laura Hodge was received by the court as an expert in gunshot residue examination. She testified that she received samples taken from Gibbs and did find the presence of gunshot residue on the samples. On cross-examination, Agent Hodge testified that she did not receive samples to test for gunshot residue from anyone else involved in the instant case. On redirect examination, Agent Hodge clarified that samples were taken to test for gunshot residue by rubbing moistened Q-tips over "the surface of the hands of the individual." She explained that if a gunshot residue test was positive, it was indicative of an individual firing, handling, or being near a gun when it was fired. On recross-examination, Agent Hodge agreed that a gunshot residue test could be performed by police officers at a crime scene.

Dr. Marco Ross was received by the court as an expert in "forensic pathology or medicine and the law." Dr. Ross performed Gibbs' autopsy on December 24, 2007. He observed a gunshot entrance wound on "the left front side" of Gibbs' chest wall that did not have an exit wound. Dr. Ross "could actually feel the bullet just underneath the skin" near Gibbs' right nipple. He agreed that it was "possible" that the shooter was "just a few feet away" from Gibbs when he shot him. Dr. Ross testified that Gibbs had a bullet wound that "scraped across the front surface of each lung," then "grazed across the front surface of the heart, leaving a defect in the front of the right side of the heart." The defect "went completely through the front wall of the heart[.]" Dr. Ross explained that approximately 30% of Gibbs' blood volume bled into his chest. He agreed that Gibbs' specific wound could cause "massive bleeding" inside his chest without causing bleeding outside of his body. Dr. Ross testified that "nothing short of an immediate operation" could have saved Gibbs, and even if that were performed, his "odds of survival" would have been "very, very low." Gibbs' toxicology report was negative for the presence of alcohol or drugs in his system. Dr. Ross collected the gunshot residue kit from Gibbs' hands. He opined that Gibbs' cause of death was a "gunshot wound to the chest."

On cross-examination, Dr. Ross confirmed that Gibbs' blood had tested negative for the presence of cocaine. He stated that all the physical evidence he recovered from Gibbs' body, including the gunshot residue samples, hair sample, nail clippings, bullet, and blood samples, were turned over to law enforcement. On redirect examination, Dr. Ross testified that the threshold amounts for the toxicology test were "very low amounts."

At the close of the State's proof, the Defendant moved for a judgment of acquittal, which the court denied. Cleopatria Brown, the Defendant's mother, testified on his behalf. She stated that she was not related to Bobo and had "never seen [him] a day in [her] life." [Brown testified that the Defendant was with her at their home "practically all day" on December 23, 2007. He went to his grandmother's house at approximately two o'clock, but he returned home because she was not there. Brown stated that she drove the Defendant to his grandmother's house at "eight thirty, eight forty-five" that night. She remembered that day because it was "payday that day." Brown affirmed that she was telling the truth and stated that she "wouldn't lie for [the Defendant]."

On cross-examination, Brown stated that she used the last name "Bobo" until she turned eighteen. She testified that on December 23, 2007, she cooked dinner for her children, including the Defendant, around "five or six in the evening." She stated that they finished eating around six o'clock and then talked and watched television in the living room together. She could not remember what they talked about or watched on the television, but she remembered that she drove the Defendant to his grandmother's house at "eight thirty or eight forty-five in the evening." She agreed that she did not call police at any time to tell them about the Defendant's alibi. Brown remembered the Defendant wearing a white shirt and gray pants on the day of the shooting.

Lillie Hood testified that she was the Defendant's grandmother. She stated that on December 23, 2007, the Defendant came to visit her at her home "[b]etween eight thirty and nine" o'clock at night. Hood elaborated that she went to sleep after the nine o'clock news at approximately ten o'clock., but the Defendant stayed in the back room of her apartment and played cards with his father. She remembered the specifics of that day because "it was close to the holiday[.]" Hood testified that she was telling the truth and would not lie on her grandson's behalf.

On cross-examination, Hood testified that she was "close" with her grandson but was unsure of his birthday, age, or whether he used the name "McArthur Hood Bobo" or "McArthur Bobo." She stated that she and her son, the Defendant's father, were at home "all day" on December 23, 2007. She did not remember what the Defendant was wearing on the night of the shooting. Hood testified that the Defendant was "gone" when she woke up the following morning. She explained that she made a mistake when she told the

defense investigator that she "went to bed at eight thirty or nine" on December 23, 2007. She denied talking to any of her family members about her testimony.

Sheureka Mitchell testified that she was the Defendant's sister. Mitchell testified that on December 23, 2007, she went to her grandmother's house around 9:10 p.m. to ask the Defendant whether they were still going Christmas shopping the following day. Mitchell explained that she lived in the apartment above her grandmother's apartment. She specifically remembered the day in question because "it was Christmas-time." Mitchell testified that she was telling the truth and was not "lying for [her] brother[.]"

On cross-examination, Mitchell elaborated that to get to her grandmother's house on December 23, 2007, she "[w]alked downstairs" and "walked in" to her grandmother's apartment, where she saw her grandmother watching television, and her father and brother were in her father's room "[p]laying cards." She estimated that she was in her grandmother's apartment for "ten or fifteen minutes." Mitchell testified that her brother was wearing a "white shirt and some pants" when she saw him at approximately 9:10 p.m. She agreed that she had discussed the Defendant's whereabouts of December 23, 2007, with her grandmother and brother "the day he went to jail" but denied that she had talked to the Defendant "recently" at the time of trial. She denied ever talking to her brother about "getting [their] stories straight[.]"

Following a jury-out hearing, the trial court allowed part of a July 5, 2009 jailhouse call recording between Mitchell and the Defendant to be played for the jury to impeach Mitchell's credibility. Mitchell denied that the Defendant instructed her what to say in her testimony and stated that he was "refreshing her memory" of December 23, 2007, because she "didn't remember everything." She reiterated that she was "testifying to what [she] kn[e]w" and agreed that although she did not remember everything on July 5, 2009, when the jailhouse call took place, she did remember everything at the time of her July 23, 2009 testimony.

The trial court held the new motion for new trial hearing on May 12, 2021, at the instruction of our supreme court. See Order, McArthur Bobo v. State, No. W2017-00681-SC-R11-CO (Tenn. Feb. 27, 2019).

## ANALYSIS

I. **Role as Thirteenth Juror.** The Defendant first contends on appeal that he was again denied his right to a motion for new trial based on the trial court making "findings of fact and affirm[ing] the verdict as the [thirteenth] juror[] based on information that was not accurate to this case." He states that the trial court was "not in a position to act as [thirteenth] juror" in the instant case "based on the trial court's statements on the record[.]"

The Defendant elaborates that the trial court was unable to determine accurately the credibility of Samuels, which was "essential to this case, especially in light of the issue regarding the written statement[.]"  The State responds that the trial court's statements regarding the evidence were accurate and that its credibility determinations deserve deference.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence."  This rule "'imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case,'" and makes "'approval by the trial judge of the jury's verdict as the thirteenth juror . . . a necessary prerequisite to imposition of a valid judgment.'"  State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)).  "'[T]he trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict.'"  Id. (quoting State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996)).  State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).  In determining the weight of the evidence, "'The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence.'"  State v. Ellis, 453 S.W.3d 889, 899 (Tenn. 2015) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)).  Because "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence . . . , the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review."  State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).  Although the duty is mandatory, the trial court is not required to make an explicit statement on the record that it has fulfilled its duty to act as thirteenth juror, and appellate courts may presume that the trial court has approved the verdict when it overrules a motion for new trial without comment.  Biggs, 218 S.W.3d at 653 (citing Carter, 896 S.W.2d at 122; State v. Brown, 53 S.W.3d 264, 274 (Tenn. Crim. App. 2000)).  Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror may an appellate court reverse the trial court's judgment.  Carter, 896 S.W.2d at 122.

Following the instant motion for new trial hearing, the trial court stated,

First, as [thirteenth] juror, I found at the time of the trial, right after the trial, I found that [the Defendant] had been proven guilty beyond a reasonable doubt in my mind.  There were several witnesses who saw him walk up to the neighborhood, stood there for a while, waiting, and then when the victim came out, they had words, walked away, came back, and then he shot him, shot down at his feet.  And then when the victim ran, he then chased

- 15 -

him around vehicles and continued to shoot. Several people saw this, people who knew [the Defendant]. So, it's clear—and this was not a self-defense case. It was clear that the victim was being chased by [the Defendant] and the witnesses who saw this were very credible witnesses.

At the time, I'm looking at this thinking, well, this is really—there's no controversy here. I had at first thought it was going to be self-defense or something. But it was just really no controversy as to who he was and that he was shooting. And because of not being able to sell drugs in that neighborhood, things like that, children being present. So, for that reason, I found him guilty beyond a reasonable doubt, as [thirteenth] juror, and the State had proven its case.

The trial court went on to describe one of the witnesses:

I remember being surprised because the first witness the State called was a prostitute. She didn't say she was a prostitute, but she clearly was having sex with people in the neighborhood and charging them money, including people around there. And [the Defendant] at first came up to her vehicle and asked her if he could have sex for her in exchange for money. And there was an issue in the trial about whether or not he left his prints on the car, whether his behind was keeping the door open or not. But she discussed the sex—having the sex with him in the bathroom before for money, and I was surprised at how she just told it like it was and was just being very honest about the whole thing.

With respect to whether Samuels actually gave an official statement, the trial court noted that it

[H]ad a couple of bench conferences at trial with the attorneys about this because everyone was surprised, the State as well as the defense lawyer, when she said that she may have made a statement. She wasn't sure, she was confused about the statement. She was very clear about what happened when she saw this man killed. But after the killing, they were trying to save the man's life and they were trying to give him CPR and the police had not come, even though 911 had been called. And so, they were loading him into a truck to take him to the hospital, and when the police arrived on the scene, they saw three people trying to load somebody in a truck as if they were kidnapping him and they were the ones who were, at first, the suspects.

- 16 -

So, she was arrested. She was placed in a squad car, and she testified that she'd never seen anybody—anything like that before and she was hysterical. They took her downtown, not to take her statement, they took her downtown because she was a suspect in a murder. And they—they—no question they talked to her. For a while, she talked about—she really didn't make a whole lot of sense. Either she or a police officer testified that she was hysterical. She'd [been] having attacks, stuff like that.

In finding that Samuels never gave a statement, or if she did, there was no proof that it would have "any bearing" on the instant case, the trial court also commented:

So, what we have is, we have somebody. We have a person who's obviously not rich, not educated. They have sex with men for money in the bathroom. And she's hysterical at the time. She just saw a man killed that she just talked to. And she goes to the police station because she's a suspect and she becomes hysterical and has asthma attacks and has no idea what happened to her.

Based on the above statements made by the trial court, the Defendant points to the trial court's misstatements that Bowman was the first witness to testify, that Samuels was the witness who testified to having sex for money, and later referring to Bowman as Chapman as evidence of the trial court's inability to act as thirteenth juror and therefore depriving him of a motion for new trial. We disagree.

While Bowman was not the literal first witness to testify at trial, she was the first witness to testify about the shooting and was the first witness to testify at the suppression hearing. Further, we note that the trial court only referred to Bowman as Chapman after the prosecutor realized the trial court was conflating Samuels and Bowman and corrected it to refer to "April Chapman," not Samuels. Unlike the first motion for new trial hearing, the trial court never referred to facts that were untrue of the instant case, though it may have conflated which witness was the source of those facts, despite the Defendant's assertions to the contrary. Although the trial court mistakenly stated Samuels was the witness who testified to having sex for money, the trial court was otherwise accurate in its recitation of the facts of the case. The trial court remembered that the case stemmed from the second-degree murder, namely shooting, of Gibbs, that there were multiple eyewitnesses to the shooting who observed the Defendant shoot Gibbs after telling him to leave the apartment complex because there were children present, and Gibbs did not want drugs sold at the complex. The trial court went on to accurately remember that there was some confusion as to whether Bowman's car was processed by law enforcement based on testimony that the Defendant may have left fingerprints on Bowman's car. The trial court was also correct in noting that Bowman knew the Defendant because she previously had

sex with him in a bathroom in exchange for money. In determining whether Samuels gave a statement, the trial court was also accurate in stating that police arrived as Samuels, Chapman, and Bobo were trying to place Gibbs in a vehicle to take him to the hospital after administering CPR, and officers had them put Gibbs back on the ground, where he died. The trial court accurately stated that Samuels was hysterical at the police station and had an asthma attack, so much so that police had to meet with her a couple of days later. The trial court also correctly remembered that the Defendant called alibi witnesses, and jailhouse calls were used to show that one of his alibi witnesses was lying under oath.

The trial court's misstatement of a last name, order of witnesses, or stating that one eyewitness had sex for money instead of the other eyewitness who testified to having sex for money did not eradicate the trial court's ability to weigh the evidence and act as thirteenth juror, as the Defendant suggests. The trial court explicitly determined that the eyewitnesses to the shooting were "very credible" witnesses and that the Defendant's alibi witnesses were "not credible[.]" This court is "ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence[.]" Moats, 906 S.W.2d at 435. After a very thorough review, there is nothing in the record on appeal or the trial record that suggests the trial court did not fulfill its duty as thirteenth juror in weighing the evidence and approving the verdict as part of the instant motion for new trial. The Defendant is not entitled to relief.

**II. Kenya Samuels' Witness Statement.** The Defendant argues that the trial court erred in not declaring a mistrial or, "at a minimum[,]" striking Samuels' testimony from the record after the State "failed to provide [her] written statement[,]" in violation of Tennessee Rule of Criminal Procedure 26.2. He elaborates that such statement is "of extreme importance as far as the potential of it containing inculpatory or exculpatory evidence." The State responds, and we agree, that the trial court properly determined that such a statement did not exist based on the testimony given at trial.

Rule 26.2 of the Tennessee Rules of Criminal Procedure is Tennessee's version of the "Jencks Act," which was created as a result of the United States Supreme Court's decision in Jencks v. United States, 353 U.S. 657 (1957). The Rule provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

. . . .If the party who called the witness disobeys an order to deliver a statement, the court shall strike the witness's testimony from the record and order the trial to proceed. If the attorney for the state disobeys the order, the court shall declare a mistrial if required in the interest of justice.

Tenn. R. Crim. P. 26.2(a), (d); see also Tenn. Code Ann. § 40-17-120(a).  In such context, "'statement' means . . . [a] written statement that the witness makes and signs, or otherwise adopts or approves; or . . . [a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement."  Tenn. R. Crim. P. 26.2(f); see also Tenn. Code Ann. § 40-17-120(b).  "The determination of what constitutes a producible statement is a matter that rests purely within the discretion of the trial judge and can be set aside by the appellate courts only if his decision is clearly erroneous."  State v. Daniel, 663 S.W.2d 809, 812 (Tenn. Crim. App. 1983).

At the instant motion for new trial hearing, the Defendant asserted that Samuels produced a written statement to police, evidenced by Samuels' equivocal testimony that she saw someone typing while she spoke to officers and remembered signing "something." He also points to the post-conviction court's finding of fact that "there was no second statement that the witness made[,]" suggesting that there was a first statement.  The State responded that the "one and only statement that [] Samuels ever gave was her preliminary hearing testimony[,]" which was provided to defense counsel."  The State elaborated that Samuels' preliminary hearing testimony was "what defense counsel was referring to in his memory of the written statement."

As an initial matter, we note that the Defendant's reliance on Rule 26.2 is misplaced. The rule requires that the State possess the statement sought by the defendant. Tenn. R. Crim. P. 26.2(a).  In the instant case, nothing in the record indicates that the State ever actually possessed any written statement made by Samuels, other than her preliminary hearing testimony, either through actual or constructive possession.  See State v. Ronald Wayne Gilbert, No. E2017-00396-CCA-R3-CD, 2018 WL 2411835, at *5 (Tenn. Crim. App. May 29, 2019), perm. app. denied (Tenn. Sept. 13, 2018).  Instead, the issue should be analyzed under the guidance of State v. Merriman, 410 S.W.3d 779 (Tenn. 2013), and State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999).  Though the Defendant cites to the factors found in Ferguson, he does nothing more than list them without any argument as to how they should be applied in the instant case.

Ferguson governs claims regarding the State's duty to preserve potentially exculpatory evidence.  2 S.W.3d at 915-17.  The proper inquiry is "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" Merriman, 410 S.W.3d at 785 (alteration in original) (quoting Ferguson, 2 S.W.3d at 914).

When a defendant makes a <u>Ferguson</u> claim, the trial court first must "determine whether the State had a duty to preserve the evidence." <u>Id.</u> The State has a general duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, and other applicable law, including <u>Brady</u>. <u>Id.</u> (citing <u>Ferguson</u>, 2 S.W.3d at 917). "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" <u>Id.</u> (quoting <u>Ferguson</u>, 2 S.W.3d at 917). To be constitutionally material, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>Id.</u> (footnote omitted) (citing <u>Ferguson</u>, 2 S.W.3d at 915, 918). If the proof establishes the existence of a duty to preserve and further shows that the State has failed in that duty, the trial court must consider the following factors to determine whether a trial without the missing evidence would be fundamentally fair: (1) the degree of negligence implicated, (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction. <u>Id.</u> (citing Ferguson, 2 S.W.3d at 917).

In the instant case, nothing in the record suggests that the State was ever in possession of a written statement from Samuels. We note that "the State is not required to investigate cases in any particular way[.]" <u>State v. Brock</u>, 327 S.W.3d 645, 698 (Tenn. Crim. App. 2009) (reiterating that "[d]ue process does not require the police to conduct a particular type of investigation" and that "the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process" (citation and internal quotation marks omitted). Regarding the first materiality prong, that the evidence must potentially possess exculpatory value, the Defendant merely theorizes that the Samuels' written statement would completely differ from her trial testimony and be exculpatory. In fact, the Defendant argues in his appellate brief that the written statement had "the potential of . . . containing inculpatory or exculpatory evidence." <u>See</u> <u>State v. Ronnie D. Sims</u>, No. M2004-02491-CCAR3-CD, 2005 WL 3132441, at *8 (Tenn. Crim. App. Sept. 21, 2005) ("[T]he mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under <u>Ferguson</u>."). With respect to the second materiality prong, that the alleged exculpatory evidence be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means, the Defendant has failed to show that he would be unable to obtain comparable evidence to the written statement. Not only did Samuels testify at the preliminary hearing and at trial, but three other eyewitnesses, including Chapman, who was with Samuels when the shooting occurred, also testified that they were familiar with the Defendant and saw him shoot and kill Gibbs. Even if the written statement existed, though the record is not indicative of such, nothing suggests that it would have exculpated the Defendant or changed the outcome of trial.

With respect to the Defendant's assertion that a jury instruction should have been given on the potential existence of a written statement as part of the "complete charge of the law," we note that the Defendant never requested such special instruction in writing and has therefore waived the issue. See Tenn. R. Crim. P. 30(a); State v. Leath, 461 S.W.3d 73, 107 (Tenn. Crim. App. 2013) (stating that the defendant's failure to file a written request for a special jury instruction on her "theory of defense" resulted in waiver); State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982) (stating that Rule 30(a) "envisions that such requests be made in writing" and that because the request for a special instruction was not made in writing, the trial court did not err in refusing to instruct the jury on the special instruction on intoxication). The Defendant does not request plain error review, and we therefore decline to undertake it. The Defendant is not entitled to relief.

**III. Motion to Suppress.** The Defendant next asserts that the trial court erred in denying his motion to suppress. He specifically contends that the trial court should have suppressed the photographic lineup that the witnesses identified him through because his photograph in the lineup was "different from the other photographs[] and designed in a way to stand out." The State responds that the trial properly denied the motion to suppress[3] and that even a "cursory examination of the photo lineup" demonstrates that it is not "unduly suggestive."

When this court reviews suppression issues, the prevailing party in the trial court "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "'Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Hawkins, 519 S.W.3d 1, 32 (Tenn. 2017) (quoting Odom, 928 S.W.2d at 23). A trial court's findings of fact in a suppression hearing will be upheld, unless the evidence preponderates against them. Id. (citing State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014)). However, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. Id. at 32-33 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider the entire record, including not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012). The defendant bears the burden of showing that the

---

[3] We note that the State's brief mistakenly refers to the trial court judge by the post-conviction court judge's name in its motion to suppress argument but correctly cites and attributes the trial court's findings to the appropriate court.

evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

Our analysis of this issue is guided by the United States Supreme Court holdings in Simmons v. United States, 390 U.S. 377 (1968), and Neil v. Biggers, 409 U.S. 188 (1972), In Simmons, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384 (1968). In Biggers, the Court established a two-part analysis which the trial court must apply to determine the validity of a pre-trial identification. 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. This court must consider the following factors in evaluating the likelihood of misidentification:

1. the opportunity of the witness to view the criminal at the time of the crime.

2. the witness's degree of attention at the time of the crime.

3. the accuracy of the witness's prior description of the criminal.

4. the level of certainty demonstrated by the witness at the confrontation.

5. the length of time between the crime and the confrontation.

State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 199); see State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). In Tennessee, it is unnecessary to apply the totality of the circumstances test described in Biggers if the trial court determines that the identification procedure was not unduly suggestive. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted); State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

The Tennessee Supreme Court has held that photographic lineups are admissible unless they are unduly suggestive:

Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from "suggestive identification procedures." Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Thus, a photographic identification is

- 22 -

admissible unless, based upon the totality of the circumstances, "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1206 (1967).

State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998). The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." Simmons, 390 U.S. 377, 383 (1968). In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Id. This Court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing U.S. v. Wade, 388 U.S. 218, 233 (1967); Shye v. State, 506 S.W.2d 169, 173 (Tenn. Crim. App. 1973); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

In the instant case, the trial court concluded at the suppression hearing that there was "nothing to indicate that [the witness is] supposed to pick [the Defendant] out[.]" The court noted that although the Defendant's picture in the photographic lineup had a "lighter background" than the other five photographs in the lineup, all of the men depicted in the photographs had similar "facial features[.]" The trial court elaborated that although the photograph was "a little suggestive[,]" it was "just the exposure of the photograph." The trial court went on to explicitly consider each factor set forth by the Supreme Court in Biggers, 409 U.S. at 199. Regarding the first factor, the trial court determined that both witnesses who testified at the suppression hearing, Bowman and Bobo, had "great opportunity to identify [the Defendant], they saw and recognized him. One of them talked with him before the shooting[,] and the other one is his cousin and has known him for years." With respect to the second factor, the trial court found that "the degree of attention of both of them is high[.]" For the third factor, the trial court noted that Bowman "said that she described him[,]" and Bobo said, "[']I told them who it was[']" because[] he knew who it was." For the fourth factor, with respect to the witnesses' level of certainty demonstrated at the confrontation, the trial court noted that both Bowman and Bobo were "absolutely certain" in their identification of the Defendant from the photographic lineup. Finally, the trial court noted that Bowman's and Bobo's identification of the Defendant occurred "immediately thereafter, that same night." Following the consideration of all five factors, the trial court found that although the "exposure on [the Defendant's photograph [wa]s lighter" than that of the other five, there was "no indication that he is the person[,]" and Bowman and Bobo were "identifying him in court [], not from a photograph that they were shown of him[] but from actually seeing him that night."

Based on our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup. The photographic lineup contains photographs of six African American males, all of whom had short, dark hair and similar facial hair. Each photograph is uniform in size. All of the men depicted in the photographs have white collars near their necks. Further, as noted by the trial court, both Bowman and Bobo were previously familiar with the Defendant and interacted with him just prior to the shooting. We agree with the trial court's finding that Bowman's and Bobo's identifications of the Defendant were reliable based on the Biggers factors, 409 U.S. at 199. Both Bowman and Bobo were completely certain that the Defendant was the person who shot Gibbs and were immediately able to identify him in the photographic lineup. We are unable to conclude that the Defendant's photograph was "grossly dissimilar" to the others. Edwards, 868 S.W.2d at 694. Accordingly, the trial court did not err in denying the Defendant's motion to suppress, and the Defendant is not entitled to relief.

**IV. Jailhouse Calls.** The Defendant argues that a portion of the jailhouse phone call that was admitted for the narrow purpose of impeaching Mitchell's credibility should have been redacted. Specifically, he argues that the Defendant's statement during the call that "I ain't seen him that n*****. I been seeing a white boy" violated Tennessee Rule of Evidence 403 in that it "could prejudice the jurors and give them irrelevant information" because the "language sounds as if [the Defendant] is either involved in illegal activity like drugs[] or homosexual activity[.]" He also argues that the use of the jailhouse calls for impeachment purposes violated his right against self-incrimination and right not to testify. The State responds that the trial court properly allowed the jury to consider the jailhouse call for the "limited purpose of measuring [] Mitchell's credibility" and that "nothing suggests that the [D]efendant was coerced or compelled" to call Mitchell. The State further responds that the Defendant did not object "to the language now considered by him to be prejudicial[] or request that it be redacted" and has therefore waived the issue.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted).

Extrinsic evidence of a prior inconsistent statement is admissible if certain procedures are followed, though such procedures are unnecessary when the inconsistent statement is also an admission by a party opponent covered by Tennessee Rule of Evidence 803(1.2). See Tenn. R. Evid. 613(b). If extrinsic evidence of a prior inconsistent statement is utilized, the trial court has the discretion to screen the evidence and pare the statement outside the presence of the jury. See Neil P. Cohen, et al., Tennessee Law of Evidence, 6.13[5][f] (6th ed. 2011).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both the Fifth Amendment and article I, section 9 provide the criminally accused the right against compelled self-incrimination. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998).

In the instant case, the recorded jailhouse call between Mitchell and the Defendant was used to impeach Mitchell's testimony regarding the Defendant's alibi from the day of the shooting after she stated that she "c[ould]n't recall" whether she had a conversation with the Defendant about "getting [their] stories straight" on July 5, 2009. The call demonstrated that Mitchell and the Defendant had in fact discussed what Mitchell and the rest of the Defendant's alibi witnesses needed to testify to at trial, including what clothing he was wearing. After the recording was played for the jury, Mitchell was given the opportunity to explain the conversation and said that the Defendant was "refreshing [her] memory" rather than instructing her what to say. She further explained that she was testifying from her own memory. The trial court gave a curative instruction to the jury that the call was to be used only for the limited purpose of impeaching Mitchell and determining her credibility and noted that the court was not admitting the jailhouse call as an exhibit.

The call was placed by the Defendant to Mitchell, and there is nothing in the record to suggest that he was "compelled" to place the call or to speak with his sister. Further, we note that before the portion of the jailhouse call was played for the jury, the trial court held a jury-out hearing to determine which portions were appropriate to be played for the jury, and the Defendant did not object to the portion he now claims to be prejudicial and irrelevant. Whether or not the Defendant's statement, "I ain't seen him that n*****. I been seeing a white boy" was relevant, we cannot conclude that such a fleeting reference to what the Defendant refers to as "illegal activity like selling drugs[] or homosexual activity" was unfairly prejudicial to the Defendant, especially given the trial court's curative instruction and the overwhelming evidence of the Defendant's guilt presented by four eyewitnesses to the shooting. We further cannot conclude that any potential error in allowing the contested portion of the jailhouse call resulted in anything other than harmless error. See State v. Cannon, 254 S.W.3d 287, 298-99 (Tenn. 2008) ("We apply a harmless error analysis to 'virtually all evidentiary errors . . . .'") (quoting State v. James, 81 S.W.3d 751, 763 (Tenn. 2002); see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The Defendant is not entitled to relief.

**V. <u>Testimony Regarding Presence of Children.</u>** The Defendant next contends that the trial court erred in allowing Bobo to testify that "the victim's children were home at the time of the shooting." He asserts that such testimony created prejudice against the Defendant and violated Tennessee Rules of Evidence 402 and 403. The State responds that the testimony was both relevant and not prejudicial.

The admissibility of evidence rests within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d 136, 141 (quoting Ruiz, 204 S.W.3d at 778).

As previously laid out, evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been

defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" Banks, 564 S.W.2d at 951.

In the instant case, Bobo was asked on cross-examination whether Gibbs' children were "there" on "the night of December 23, 2007," to which he responded, "Yes." Trial counsel objected based on relevance, and the trial court held a bench conference. The trial court asked the State what the relevance was regarding the children's presence, and the State responded that their presence was "one of the reasons [Gibbs] asked the [D]efendant to leave." The trial court responded that although Bobo did not have "personal knowledge" regarding why the Gibbs "didn't want trouble," the presence of the children, though "not that relevant[,]" was "not prejudicial[.]" The trial court also cautioned the State against any "hearsay comments about the victim." No further testimony was given regarding the presence of children.

We agree with the State's assertion that Bobo's testimony regarding the presence of Gibbs' children was relevant to show why Gibbs approached the Defendant in the first place and wanted him to leave the apartment complex, initiating the interaction that culminated in Gibbs' death. We also agree that the sparse testimony regarding the children, which was limited to Bobo stating their ages and responding, "Yes," when asked if they were at the complex on the night of the shooting, was not prejudicial to the Defendant. Given the otherwise overwhelming proof stemming from four eyewitnesses to the shooting, any error in admitting Bobo's testimony regarding the presence of children was harmless. See Cannon, 254 S.W.3d at 298-99 ("We apply a harmless error analysis to 'virtually all evidentiary errors . . . .'") (quoting James, 81 S.W.3d at 763; see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The Defendant is not entitled to relief.

**VI. Cumulative Error.** The Defendant argues, and the State disagrees, that he is entitled to relief under the cumulative error doctrine. The cumulative error doctrine provides, in short, as follows:

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted). Because we have determined that the trial court did not err on any of the Defendant's aforementioned issues,

we need not consider the cumulative effect of the alleged errors. <u>Hester</u>, 324 S.W.3d at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

## **<u>CONCLUSION</u>**

Based upon the above reasoning and analysis, we affirm the judgment of the trial court.

_____

CAMILLE R. MCMULLEN, JUDGE